Dennis GREENWALD, individually and as Supervisor of the Town of Mamakating, Sullivan County, New York, Richard Diffendale, Daniel Thomas, Nicholas Salamone, and Henry Young, individually and as Members of the Town Board of the Town of Mamakating, Sullivan County, New York and on behalf of all the residents of the Town of Mamakating similarly situated; and the Town of Mamakating, Sullivan County, New York; David Kaufman, individually and as Supervisor of the Town of Thompson, Sullivan County, New York, Joel Lerner, Aaron Pollock, William J. Reiber, and Anthony Cellini, individually and as Members of the Town Board of the Town of Thompson, Sullivan County, New York, and on behalf of all the residents of the Town of Thompson similarly situated; and the Town of Thompson, Sullivan County, New York, Plaintiffs,

v.

The BOARD OF SUPERVISORS OF the COUNTY OF SULLIVAN and the County of Sullivan, Defendants.

Fred HAAS, Richard Lanza, Paula Yeager, Gladys S. Sunshine and Tom Brown, individually and as officers and directors of the Sullivan County Chamber of Commerce and Industry, Inc., and Sullivan County Chamber of Commerce and Industry, Inc., Plaintiffs,

v.

COUNTY OF SULLIVAN, Board of Supervisors of the County of Sullivan and State of New York, Defendants.

Nos. 82 Civ. 5488, 82 Civ. 5596.

United States District Court,
S.D. New York.

June 27, 1983.

Stephen L. Oppenheim, Monticello, N.Y., for Greenwald plaintiffs.

William C. Rosen, County Atty., Monticello, N.Y., for Greenwald and Haas defendants.

Orseck, Orseck, Levine & Greenberg, Liberty, N.Y., for Haas plaintiffs; Gerald Orseck, Liberty, N.Y., of counsel.

OPINION

EDWARD WEINFELD, District Judge.

These are two related actions which seek to declare that the plan of apportionment for allocating votes to the members of the Board of Supervisors of Sullivan County (the "Board") is unconstitutional because it allegedly denies residents of towns within the County equal representation. The challenge in each action rests upon a different theory. But at the center of each attack is the use of an adjusted weighted voting plan that apportions voting power among members of the Board.

Sullivan County is geographically part of New York State's southern tier at the foothills of the Catskill Mountains. Though well known for its resort industry, more than 60,000 persons are permanent residents.[1] They are dispersed among fifteen townships that range in population from under 1,000 to over 10,000 people.[2]

County government in New York State is two-tiered. The County of Sullivan is a municipal corporation and a political subdivision of the State, composed of the fifteen townships. Each township is also a municipal corporation and a political subdivision of the State. Each elects a town board consisting of a supervisor and four council persons. All are elected at large by the town residents. The supervisor is the executive of the town; by virtue of his position he is also a member of the County Board of Supervisors. This board of fifteen constitutes the County's legislative body. Up to 1965 each supervisor had one vote regardless of the population of the town he represented even though then, as now, townships varied greatly in population.[3] This disparity led to litigation.

In 1965 it was held in *Shilbury v. Board of Supervisors*[4] that the Board of Supervisors, as made up of the fifteen town supervisors, was unconstitutional and in violation of the one person one vote principle as enunciated by the Supreme Court of the United States in *Baker v. Carr*[5] and its progeny.[6] The decree entered upon that ruling by then State Supreme Court Justice and now Chief Judge of the New York State Court of Appeals, Lawrence Cooke, provided that the existing Board of Supervisors continue in office and that a valid plan of apportionment for the Board of Supervisors be adopted in time for the general election of 1967. Thereafter, a local law was adopted by referendum under which the Board was reapportioned on an adjusted weighted voting plan in accord-

---

1. The Court accepts the census figures as correctly stating County population. Whether this is so as regards the number of County residents for apportionment purposes is contested by the plaintiffs in the Greenwald action. The Court reaches this issue below.

2. The towns within Sullivan County and their respective populations are:

| | |
|---|---|
| Bethel | 3,335 |
| Callicoon | 2,998 |
| Cochecton | 1,330 |
| Delaware | 2,783 |
| Fallsburg | 9,161 |
| Forestburg | 796 |
| Fremont | 1,346 |
| Highland | 1,878 |
| Liberty | 9,879 |
| Lumberland | 1,210 |
| Mamakating | 7,717 |
| Neversink | 2,840 |
| Rockland | 4,207 |
| Thompson | 13,550 |
| Tusten | 1,424 |
| | 64,454 |

3. The ratio between the most populous and least populous towns exceeds 10:1. *See* note 2 *supra.*

4. 46 Misc.2d 837, 260 N.Y.S.2d 931, 935 (Sup.Ct. Sullivan Co.1965), *aff'd per curiam,* 25 A.D.2d 688, 267 N.Y.S.2d 1022 (3d Dep't 1966). *See also Shilbury v. Board of Supervisors,* 54 Misc.2d 979, 284 N.Y.S.2d 124 (Sup.Ct. Sullivan Co.1967).

5. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

6. *See, e.g., Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967); *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971).

ance with the population distribution of the last census. In the judgment entered on September 20, 1967, in the *Shilbury* action, Justice Cooke approved the plan as "constitutional and valid." This plan remained in effect until after the publication of the 1970 census county data when adjustments were made to take into account population changes. In 1982, based upon the 1980 census figures, the Board, after public hearings, adopted Local Law No. 6 pursuant to Section 10 of the Municipal Home Rule Law of New York State ("Section 10"), which was passed in 1969 and authorizes weighted voting as a valid method of reapportionment of votes of Boards of Supervisors of Counties.[7]

The two actions now before the Court are brought by different plaintiffs with different objectives. In one, commenced by Fred Haas and four other citizens and residents of Rockland, Callicoon, Liberty and Fallsburg, towns within Sullivan County ("Haas action"),[8] they attack Section 10 and Local Law No. 6 as unconstitutional per se. The second action, by Dennis Greenwald and other named plaintiffs, individually and as supervisors of the towns of Mamakating and Thompson within Sullivan County, ("Greenwald action")[9] seek to declare Local Law No. 6 unconstitutional as applied because: (1) it is based on population figures containing substantial numbers of nonresidents; and (2) it does not permit represent-

atives of one third of the population plus one to prevent the adoption of a two-thirds resolution where required. The Greenwald plaintiffs, however, do not challenge the constitutionality of weighted voting plans per se, and request that Local Law No. 6 remain in effect until the Board has adopted a new reapportionment plan pursuant to an order of this Court.

All parties move for summary judgment pursuant to Fed.R.Civ.P. 56, alleging there are no disputed issues of material fact.

### THE HAAS ACTION

The plaintiffs make a frontal attack on all weighted voting plans. As stated by them, it is their "simple and sole contention . . . that 'weighted-voting' *per se* is unconstitutional, period."[10] The argument rests upon a contention that weighted voting does not satisfy the one person one vote requirement. At the outset it is noted that the one person one vote principle applies to elective legislative bodies exercising general governmental powers at the county and town level, the subject of this action.[11] Also, despite plaintiff's *ipse dixit* of the per se invalidity of adjusted voting plans of reapportionment, they have been recognized as a legal method of legislative apportionment.[12] Indeed, the Supreme Court has noted that the constitutional principles that govern the apportionment of state legislatures are not necessarily applicable to the

---

7. N.Y.Mun. Home Rule Law § 10(1)(a)(13) (McKinney 1982).

8. Originally, the Sullivan County Chamber of Commerce and Industry, and its corporate officers, were plaintiffs in this action. Their claims have been withdrawn, however, on the ground that they have no standing to sue.

9. A class action is also brought on behalf of residents of Mamakating and Thompson. No action has been taken to certify the class. Also named as plaintiffs are the towns and town boards of each.

   The County has challenged the standing of the towns to bring suit under state law. This precise issue is now before the state courts. *See* County of Sullivan v. Town of Thompson, Nos. 55, 69 (Sup.Ct. Sullivan Co. August 30, 1982). Because, as the County concedes, there are other named plaintiffs who unquestionably

have standing to bring suit, the Court sees no purpose in resolving this matter of state law.

10. Haas Plaintiffs' Memorandum of Law at 2 (emphasis in original).

11. *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); *Seaman v. Fedourich,* 16 N.Y.2d 94, 101, 262 N.Y.S.2d 444, 449, 209 N.E.2d 778, 781 (1965).

12. *See Franklin v. Krause,* 32 N.Y.2d 234, 344 N.Y.S.2d 885, 298 N.E.2d 68 (1973), *app. dismissed,* 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974); *Town of Carmel v. Board of Supervisors,* 27 N.Y.2d 975, 318 N.Y.S.2d 503, 267 N.E.2d 277 (1970); *Iannucci v. Board of Supervisors,* 20 N.Y.2d 244, 282 N.Y.S.2d 502, 229 N.E.2d 195 (1967); *Jones v. Board of Supervisors,* 46 A.D.2d 102, 361 N.Y.S.2d 718 (3d Dep't 1974).

organization of local legislative bodies. "Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation." [13]

Adjusted weighted voting has been recognized as a means of overcoming malapportionment of representation in local legislative bodies and to assure that sparsely populated areas of a political unit of government have a voice in the councils of government.[14] In substance it allocates voting power among members of a governmental body so as to offset the differences in the size of the constituency of each representative. It is designed to allocate voting power to a legislator based upon the percentage of the residents of the County residing in his town. It accomplishes this by allocating voting power to each representative of a constituency in such a manner that the power of the representative to affect the outcome of votes in the theoretical number of possible voting combinations is equal to the proportion the population his town bears to the total population.[15] For such a system to be valid, "[a] legislator's voting power, measured by the mathematical possibility of casting his decisive vote, must approximate the power he would have in a legislative body which did not employ weighted voting." [16] The mathematics of such a system are complex and require sophisticated computer analyses. "Ideally, [however], it should be mathematically possible for every member of the legislative body to cast the decisive vote on legislation in the same ratio which the population of his constituency bears to the total population." [17]

In *Iannucci v. Board of Supervisors* [18] the New York State Court of Appeals recognized "adjusted weighted voting plans" as a constitutional method of local legislative apportionment. However, the Court noted that:

> The significant standard for measuring a legislator's voting power ... is not the number or fraction of votes which he may cast but, rather, his "ability ..., by his vote, to affect the passage or defeat of a measure." ...

Of course, in any weighted voting scheme, those representatives who cast

---

13. *Sailors v. Board of Education*, 387 U.S. 105, 110–11, 87 S.Ct. 1549, 1553, 18 L.Ed.2d 650 (1967). *See also Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967).

14. *Iannucci v. Board of Supervisors,* 20 N.Y.2d 244, 251, 282 N.Y.S.2d 502, 507, 229 N.E.2d 195, 198 (1967).

15. "Votes" and "voting power" are two distinct, though related, concepts. A vote is simply an expression of a view on a particular matter. The number of votes for or against a proposition determines whether it will carry or be defeated. Voting power is the ability of an individual to cast the deciding vote on an issue; the frequency with which a change in his vote alone will alter the outcome of the decision. An example will illustrate the difference. Assume the Board is composed of 5 members, 4 with one vote each, and 1 with 5 votes. On any given issue, the number of votes cast will be nine. Where but a simple majority of the votes is necessary to carry a proposition, however, the representative from the larger town will cast the deciding vote 100% of the time. Thus, although he has only 55.55% of the votes, he has 100% of the voting power. In contrast, on matters requiring a two-thirds majority vote, the representative from the larger town alone will not have sufficient votes to carry a measure. Thus, to succeed in passing a resolution, it is necessary for him to convince at least one other representative to vote in its favor. Accordingly, although his number of votes remains the same, his voting power is diminished. *See generally* R. Dixon, Democratic Representation: Reapportionment in Law and Politics 516–20 (1968); Banzhaf, Weighted Voting Doesn't Work: A Mathematical Analysis, 19 Rutgers L.Rev. 317 (1965); Johnson, An Analysis of Weighted Voting as Used in Reapportionment of County Governments in New York State, 34 Albany L.Rev. 1 (1969); Weinstein, The Effect of the Federal Reapportionment Decisions on Counties and Other Forms of Municipal Government, 65 Colum.L.Rev. 21 (1965).

16. *Iannucci v. Board of Supervisors,* 20 N.Y.2d 244, 252, 282 N.Y.S.2d 502, 508, 229 N.E.2d 195, 199 (1967).

17. *Id.* at 252, 282 N.Y.S.2d at 508, 229 N.E.2d at 199.

18. 20 N.Y.2d 244, 282 N.Y.S.2d 502, 229 N.E.2d 195 (1967).

the larger aggregates of votes can be expected to have greater influence with their colleagues than representatives with only a single vote. We find nothing unconstitutional in a disparity of influence among the various members of a county board of supervisors....

The principle of one man-one vote is violated, however, when the power of a representative to affect the passage of legislation by his vote, rather than by influencing his colleagues, does not roughly correspond to the proportion of the population in his constituency.[19]

It was in response to this ruling that in 1969 the Legislature added sub-part 13 to section 10 of the Municipal Home Rule Law, which authorizes weighted voting as a method of reapportionment for representation on county Boards of Supervisors and other units of government here under attack by plaintiff as unconstitutional.[20]

■ Subsequent New York State Court of Appeals cases continue to uphold the concept of adjusted weighted voting.[21] Thus the Haas plaintiffs' per se attack is without substance. Local Law No. 6 is based upon a computer analysis by an expert who was engaged by the County and

was adopted after public hearings. Under this plan the voting power is distributed according to the percentage of population of a town as against the total population of the entire County. For example, the least populated town, Forestburg, with a population of 796, out of a total County population of 64,454, constitutes 1.23%, whereas the largest town, Thompson, with a population of 13,550, accounts for 21.02% of the total population of the County. In broad terms, the plan distributes the voting power of the supervisors as closely as possible to the percentage of the population that he represents. To effectuate this, the total supervisors' vote on any proposal requiring a majority vote is fixed at 2,004,[22] and a specific number of this total is allocated to each supervisor according to the population of his town. Thus, in the instance of Forestburg, its supervisor was allocated 29 votes, which is 1.45% of the total vote and 1.24% of the voting power. On the other hand, Thompson's supervisor was allocated 391 votes out of a total of 2,004 which is 19.51% of the vote and 21.01% of the voting power. Similar allocations were made on the same basis with respect to the supervisors of the 13 other towns.[23]

---

**19.** *Id.,* 20 N.Y.2d at 251–52, 282 N.Y.S.2d at 507–08, 229 N.E.2d at 198–99 (citations omitted).

**20.** The statute provides in part:
  (13)(c.) ... Such a plan may allocate, by extrapolation or any other rational method, such latest statistical information to representation areas or units of local government, provided that any plan containing such an allocation shall have annexed thereto as an appendix, a detailed explanation of the allocation....
  (f.) ... no local government may restructure its local legislative body ... more than once in each decade commencing with the year nineteen hundred seventy; *provided, however, that this prohibition shall not prevent the periodic adjustment of the weight of the votes of representatives on the basis of current census, voter and other valid information where an existing plan distributes the votes of representatives on such basis.* (emphasis added)

**21.** *See* note 12 *supra.*

**22.** Most issues before the Board require a simple majority for passage. In some circum-

stances, however, state law requires approval of two-thirds of the Board. *See, e.g.,* N.Y. County Law § 153(4) (McKinney 1972); N.Y. Mun. Home Rule Law § 20(4) (McKinney 1969). Thus, for matters requiring only a simple majority for passage, 1,003 out of the 2,004 votes are required. A total of 4,002 votes can be cast on two-thirds majority issues, requiring 2,668 votes for passage. *See* note 23 *infra.*

**23.** The number of votes and voting power of each supervisor is as follows:

MAJORITY RULE VOTES

| TOWN | % OF COUNTY POPULATION | VOTES | VOTING POWER |
|---|---|---|---|
| Bethel | 5.17 | 102 | 5.25 |
| Callicoon | 4.65 | 93 | 4.59 |
| Cochecton | 2.06 | 42 | 2.04 |
| Delaware | 4.32 | 87 | 4.28 |
| Fallsburg | 14.21 | 293 | 14.23 |
| Forestburg | 1.23 | 29 | 1.24 |
| Fremont | 2.09 | 43 | 2.11 |
| Highland | 2.91 | 57 | 2.91 |
| Liberty | 15.33 | 310 | 15.39 |
| Lumberland | 1.88 | 39 | 1.87 |
| Mamakating | 11.97 | 255 | 11.90 |
| Neversink | 4.41 | 89 | 4.41 |

In an effort to overcome the decided weight of authority, plaintiffs appeal to the Court's "common sense" [24] by arguing that weighted voting elevates the rights of townships over the rights of individuals by a "misplaced concern for with 'voting power of the towns' instead of the voting power of the *individual*." [25] The contention, though not clearly articulated, appears to be that under Local Law No. 6 the residents of the three largest towns are deprived of their voting power based on a numerical count— that "[t]here is a built in bias against the three largest towns." [26] The thrust of their position is that an apportionment plan such as Sullivan County's violates the one person one vote principle if when representatives of more than half of the County residents are opposed to a bill, they cannot defeat it where its passage requires approval of a majority of the Board. The argument is based on the premise that if more than half of the County residents oppose a bill, as a constitutional matter, it should fail of passage. They postulate the following example: The towns of Liberty, Fallsburg and Thompson have a combined population of 32,590, more than half of the County population of 64,454. The combined votes of the representatives of the three towns, however, is 994 out of 2,004, which is less than a majority. Thus, a bill favored by all the residents of those three towns can be defeated if the representatives from the other twelve towns vote against it. Moreover, plaintiffs argue, it may be that some of the residents of the other twelve townships also favor the bill. The argument continues that so long as more than half of the residents from the smaller towns oppose the bill, their representatives will vote against it, and the bill will be defeated. Put to the extreme, plaintiffs argue that if all the residents of the three large towns favor a bill, plus about 15,500 others, which is slightly less than half of the residents of all other towns—a total of approximately 48,000 in all—the bill will still be defeated even though only 16,000 County residents oppose it.

The basic fallacy is the plaintiffs' premise that the vote of each individual resident of the townships is to be considered. It overlooks the fact that the Board is a legislative body composed of representatives of the town constituencies. It is the representatives who cast the vote and, as already noted, their voting power is allocated in accordance with the number of residents within their respective towns or legislative districts. Plaintiffs also disregard the fact that the supervisor's voting power approximates as closely as possible the proportion of the population in his constituency. Thus, the supervisors of the three large towns have more than 50% of the voting power. Accordingly, the representatives of a majority of the County population will rule the day most of the time. Moreover, the Haas argument rests on three erroneous assumptions. First, that the precise division on an issue envisioned above could ever be deter-

| TOWN | % OF COUNTY POPULATION | VOTES | VOTING POWER |
|---|---|---|---|
| Rockland | 6.53 | 129 | 6.54 |
| Thompson | 21.02 | 391 | 21.01 |
| Tusten | 2.21 | 45 | 2.23 |
| | 100 | 2004 | 100 |

TWO–THIRDS MAJORITY RULE VOTES

| TOWN | % OF COUNTY POPULATION | VOTES | VOTING POWER |
|---|---|---|---|
| Bethel | 5.17 | 207 | 5.22 |
| Callicoon | 4.65 | 172 | 4.68 |
| Cocheton | 2.06 | 83 | 2.08 |
| Delaware | 4.32 | 169 | 4.39 |
| Fallsburg | 14.21 | 580 | 14.20 |
| Forestburg | 1.23 | 45 | 1.26 |
| Fremont | 2.09 | 83 | 2.08 |
| Highland | 2.91 | 122 | 2.92 |

| TOWN | % OF COUNTY POPULATION | VOTES | VOTING POWER |
|---|---|---|---|
| Liberty | 15.33 | 623 | 15.49 |
| Lumberland | 1.88 | 80 | 1.87 |
| Mamakating | 11.97 | 494 | 11.74 |
| Neversink | 4.41 | 170 | 4.50 |
| Rockland | 6.53 | 250 | 6.51 |
| Thompson | 21.02 | 839 | 20.84 |
| Tusten | 2.21 | 85 | 2.21 |
| | 100 | 4002 | 100 |

24. Haas Plaintiffs' Memorandum at 4.

25. *Id.* at 5 (emphasis in original).

26. *Id.* at 8.

mined.[27] Only by a referendum in which each voter expressed his view could this information be ascertained. Second, merely because more than half of the population of a town favored an issue does not necessarily mean that the supervisor would vote in favor of it. Indeed, whatever the supervisor's political philosophy, he is under no legal obligation to accept the views of a perceived majority.[28] Finally, there is also the question of whether a member of a body governing the conduct of all County residents will impose the wishes of a small minority onto the majority. This, again, involves the personal philosophy of the elected official—whether he views his role as one concerned solely with the interests of his immediate town constituency, or whether he accepts responsibility for the interests of Sullivan County as an entirety.

The Court concludes that the weighted voting plan under Local Law No. 6 is constitutional and does not deprive plaintiffs of their rights under the one person one vote principle. The motion to dismiss the Haas complaint is granted.

## THE GREENWALD ACTION

These plaintiffs recognize adjusted weighted voting as a valid method of reapportionment. However, they attack Local Law No. 6 as unconstitutional on two separate grounds: (1) that the population figures upon which the plan is based includes a substantial number of nonresidents, and (2) that it does not permit representatives of one-third of the population plus one to prevent adoption of a resolution requiring a two-thirds vote of the Board of Supervisors.[29] We consider each challenge separately.

### A. Inclusion of Nonresidents.

Local Law No. 6 was based upon the raw data population as shown in the 1980 federal census. These figures included within the County population three specific groups who plaintiffs claim are nonresidents and should not have been included for apportionment purposes: (1) students at community colleges; (2) residents at group quarters, such as drug rehabilitation clinics or federally financed job corps installations; and (3) nonrelatives living in households. Upon plaintiffs' calculations, which are based upon information supplied to them by the County, the groups total almost 4,000 persons, approximately 7% of the entire County population. They further allege that because the members of these groups are not evenly distributed among the fifteen towns, their inclusion for apportionment purposes has a substantial impact on the allocation of voting power among the members of the Board. Thus, for example, plaintiffs allege that 908 individuals within such groups were improperly included as residents of Liberty, which is 10% of the town's population. Similarly, they claim that 434 persons were wrongly included as residents of Delaware, 18% of its population.[30] The County, in response, contends that the inclusion of such groups in the County population was proper because they

27. Cf. J. Ely, Democracy and Distrust 181–83 (1980) (pointless to tailor constitutional law to absurd circumstances).

28. In the words of Edmund Burke, "[y]our representative owes you, not his industry only, but his judgment, and he betrays you instead of serving you if he sacrifices it to your opinion."

29. These plaintiffs do not question the validity of the plan with respect to a majority vote where applicable.

30. The number of persons plaintiffs claim were improperly included as residents, and the percentage of each town's population they represent, are as follows:

|  | NUMBER | PERCENTAGE |
|---|---|---|
| Bethel | 142 | 4 |
| Callicoon | 167 | 6 |
| Cochecton | 0 | 0 |
| Delaware | 434 | 18 |
| Fallsburg | 1263 | 16 |
| Forestburg | 42 | 6 |
| Fremont | 31 | 2 |
| Highland | 33 | 2 |
| Liberty | 908 | 10 |
| Lumberland | 56 | 5 |
| Mamakating | 57 | 1 |
| Neversink | 0 | 0 |
| Rockland | 70 | 2 |
| Thompson | 704 | 5 |
| Tusten | 68 | 5 |

were included in the census count; moreover, they urge that the Bureau of the Census records contain no breakdown of group quarters, and finally contend that ascertaining the correct information is difficult if not impossible and that the cost of a detailed analysis of the population as requested by the plaintiffs does not justify further analysis or investigation.

Section 10(1)(a)(13) of the Municipal Home Rule Law authorizes counties to base apportionment of votes on the County Board on the population of "residents, citizens, or registered voters." Sullivan County has chosen to base its apportionment plan on residents. The statute, however, does not define the term "resident." Defendants urge that those persons included within the census count are residents for apportionment purposes. According to the census guidelines, such persons include all who are found in the County, including the three groups challenged by the plaintiffs, save for persons in short term wards of hospitals who were counted at their usual place of residence. The fact that the federal census includes such persons is not controlling. Residence is a matter of state and not federal law.[31] Moreover, defendants' position is not consistent. Inmates in correctional institutions located within the County, who are included in the County population by the census, have been excluded for apportionment purposes. For example, 701 inmates at a correctional facility in the Town of Fallsburg were excluded in the computation of the population of towns under Local Law No. 6. That number constituted 7.1% of the Town of Fallsburg. The explanation given is that prisoners "have

lost major aspects of their rights as citizens and cannot vote."[32] However, this hardly explains the inclusion of students and others who plaintiffs claim are nonresidents since, as already noted, the Sullivan County plan of apportionment is based on residents, and not "citizens ... or registered voters."

As observed above, the Municipal Home Rule Law does not define who a resident is for apportionment purposes. Accordingly, we look to other provisions of state law on this issue. Section 1 of Article II of the New York State Constitution provides that a person who is 21 years of age, and has "been a resident of th[e] state, and of the county, city, or village for three months next preceding an election" has the right to cast a vote in a New York State election. Residence under this provision is equivalent to domicile,[33] and is defined as a place "which the voter voluntarily chooses, and has a right to take as such, and where he is at liberty to leave, as interest or caprice may dictate, but without any present intention to change it."[34] Section 4 of Article II makes clear, however, that, "[f]or the purpose of voting, no person shall be deemed to have gained or lost a residence, by reason of his presence or absence ... while a student at any seminary of learning, nor while kept at any almshouse, or other asylum, or institution wholly or partly supported at public expense or by charity; nor while confined in any public prison." With these groups, mere presence in a community is not sufficient to establish residence: "physical presence, without more, naturally and by constitutional mandate ... is deemed evidence merely of an intention to reside temporarily in a particular district."[35] The County's

---

**31.** Who is a "resident" for purposes of Municipal Home Rule Law § 10(1)(a)(13) is a matter of state law. *Cf. In re Knapp,* 575 F.2d 341, 343–44 (2d Cir.1978) (state law controls meaning of term "residence" in New York UCC).

**32.** Defendants' Reply Memorandum of Law at 2.

**33.** *De Meli v. De Meli,* 120 N.Y. 485, 491, 24 N.E. 996, 998 (1890); *Matter of Rooney,* 172 A.D. 274, 278, 159 N.Y.S. 132, 135 (3d Dep't 1916); *Altimari v. Meisser,* 45 Misc.2d 1008, 258 N.Y.S.2d 737 (Sup.Ct. Nassau Co.), *aff'd,*

23 A.D.2d 865, 259 N.Y.S.2d 680 (2d Dep't), *rev'd on other grounds,* 16 N.Y.2d 629, 261 N.Y.S.2d 73 (1965).

**34.** *People v. Cady,* 143 N.Y. 100, 105, 37 N.E. 673, 674 (1894).

**35.** *Palla v. Suffolk Co. Board of Elections,* 31 N.Y.2d 36, 47–48, 334 N.Y.S.2d 860, 867, 286 N.E.2d 247, 252 (1972) (citations omitted). *See also Cesar v. Onondaga County Board of Elections,* 54 A.D.2d 1108, 389 N.Y.S.2d 58, 59 (4th Dep't 1976); *Brazie v. Chiavaroli,* 53 A.D.2d 1057, 385 N.Y.S.2d 953, 954 (4th Dep't 1976).

treatment of prisoners is consonant with this definition of residence;[36] but its treatment of students and group-quarters residents is not. It may well be that some number of the students who attend college within Sullivan County have qualified to vote or have otherwise manifested an intent to claim residency there, but whether they have done so does not appear from the record. Similarly, the County asserts that college students and persons in group quarters counted within the County population under the census were not counted in their place of origin. But this assertion is without factual support in this record.

■ The Court concludes that residence for local apportionment purposes, as with voting rights, requires both presence and an intent to remain. Consistent with the definition of residence for voting rights purposes, mere presence in Sullivan County does not imply an intent to remain as to those groups described in Article II, section 4, of the New York Constitution. Thus, absent a showing of intent to make Sullivan County their place of residence, the inclusion of all students and individuals living in group quarters, such as in drug rehabilitation clinics and job corps centers, is error.[37] Although the precise impact of a readjustment of population cannot be determined on this record, even conservative estimates suggest that it will have a significant impact on the allocation of votes and voting power on the County Board.[38]

The County contends that rectifying the population statistics requires making calculations that are both difficult and expensive. Mathematical precision, however, is not required.[39] The alleged difficulty is more apparent than real. Students and residents at group quarters are usually at institutional installations where the required information as to residence or nonresidence should be readily available. The County is required to engage in a reasonable effort to identify and determine whether members of the groups identified above have manifested an intent to remain in the County such that they are residents for purposes of apportionment.[40] Absent such evidence, they must be excluded.

## B. Two-Thirds Votes

The Greenwald position is somewhat the reverse of the Haas plaintiffs, whose basic claim was that Local Law No. 6 infringed upon the voting power of the residents of the three largest towns. The Greenwald plaintiffs argue that the application of adjusted weighted voting where a two-thirds vote is required for passage of a measure violates the rights of the residents of the smaller towns. They stress that the requirement of a two-thirds vote is limited to issues deemed of major importance to the

---

**36.** Similarly, this is true of "non-relatives living in households," a group also not falling within the scope of Art. II, section 4.

**37.** *Compare Seaman v. Fedourich,* 16 N.Y.S.2d 94, 262 N.Y.S.2d 444, 209 N.E.2d 778 (1965) (exclusion of patients in mental hospital in population for apportionment purposes "without any investigation" held invalid); *with Dona v. Board of Supervisors,* 48 Misc.2d 876, 266 N.Y.S.2d 229 (Sup.Ct. St. Lawrence Co. 1966) (inclusion of students and mental patients in population where they are found, as opposed to where their homes are, held invalid).

**38.** For example, plaintiffs claim that 1263 people were improperly included in Fallsburg's population. If only half of those individuals are nonresidents, those 600 some-odd people would be more than 50% of the combined populations of Cochecton, Forestburg, Fremont and Lumberland.

**39.** As the Court stated in *Abate v. Mundt,* 403 U.S. 182, 185, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399 (1971), "electoral apportionment must be based on the general principle of population equality.... 'Mathematical exactness or precision is hardly a workable constitutional requirement.'" (*quoting Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964)). *See Franklin v. Krause,* 32 N.Y.2d 234, 239, 344 N.Y.S.2d 885, 889, 298 N.E.2d 68, 71 (1973), *app. dismissed,* 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974); *Jones v. Board of Supervisors,* 46 A.D.2d 102, 361 N.Y.S.2d 718, 721 (3d Dep't 1974); *Honig v. Rensselaer County Legislature,* 37 A.D.2d 658, 322 N.Y.S.2d 332 (3d Dep't), *aff'd,* 29 N.Y.2d 630, 324 N.Y.S.2d 417, 273 N.E.2d 143 (1971).

**40.** *See, e.g., Seaman v. Fedourich,* 16 N.Y.2d 94, 105, 262 N.Y.S.2d 444, 452, 209 N.E.2d 778, 784 (1965).

7

community and as to which it has been decided a minority of the votes may block the wishes of a majority. Thus the rationale is that any plan which deprives the smaller group of its negative voting power violates the one person one vote concept, and that whenever more than one third of the residents of the County are opposed to a measure requiring two-thirds approval, it must be defeated. Their basic argument, however variously stated, is that the representatives of more than one third of the County population ("one-third plus one") should always be able to defeat a measure that requires a two-thirds vote for approval.

Plaintiffs contend that Local Law No. 6 does not achieve this purpose. Under that law, where a two-thirds vote is required, the total number of votes authorized to be cast is 4,002, and 2,668 are necessary to pass a measure. In this instance, as in majority vote circumstances, each supervisor is allocated a number of votes in proportion to the ratio of the population of the town he represents to that of the County. Plaintiffs base their claim of the invalidity of Local Law No. 6 on the ground that there are combinations in which the representatives of more than one-third of the population cannot block the passage of a two-thirds vote. Thus, Bethel, Callicoon, Delaware, Fallsburg, Fremont and Highland have a combined population of 21,501, which is sixteen more than one third of the County population. Yet, the representatives from those towns combined have only 1333 votes out of a total 4002, which leaves them two votes short of being able to block the measure. Therein, plaintiffs assert, lies the constitutional infirmity.

█ As with the Haas claim, the underlying fallacy of the Greenwald plaintiffs' position is their failure to recognize that County government is a representative democracy, and it is the votes of the elected

representatives, not the individual residents, that effect legislation. Moreover, their contention that there is something constitutionally talismanic about the ability of the representatives of one-third plus one of the population to block two-thirds vote bills does not withstand analysis. No explanation is given as to why it is more important for representatives of more than one-third of the County residents to be able to block two-thirds legislation than it is for representatives of more than half of the population to block matters requiring a simple majority approval. This is inconsistent with the Greenwald plaintiffs' position that adjusted weighted voting, and Local Law No. 6 in particular, is constitutionally proper in majority vote circumstances. Plaintiffs attempt to explain the apparent inconsistency by stressing the importance in our democracy of preserving the rights of minorities—which the requirement of a two-thirds vote is designed to do. One cannot dispute this proposition. The ability of the minority to restrain the will of the majority is an important element of our democratic system; one that is the particular role of the judiciary to preserve.[41] That only a "veto" held by *precisely* one-third plus one of the population can accomplish this, however, is an unsupported assumption. Plaintiffs elevate form over substance. It is true that in the combination noted above if Board members representing six towns with a combined 33.36% of the County population vote to disapprove a measure requiring approval of two-thirds, and all others vote in favor, it will pass. Yet, swaying a single other supervisor will lead to the opposite result: the measure will be defeated. Indeed, it appears that any combination of supervisors representing more than 33.36% of the population will always be able to veto a matter requiring two-thirds majority approval.[42]

Even accepting the literal thrust of plaintiffs' position, the Court does not find any

**41.** *See, e.g.,* J. Ely, Democracy and Distrust (1980); Symposium, Constitutional Adjudication and Democratic Theory, 56 N.Y.U.L.Rev. 260 (1981).

**42.** If the coalition posited above is altered in any way, the outcome of the vote will be different. Thus, if Delaware, with 2783 residents, is replaced by Neversink, with 2840 residents, or if Fremont, with 1346 residents, is replaced by Tusten, with 1424, the bill will be defeated. The measure would also fail if any other supervisor joined the coalition.

constitutional infirmity in Local Law No. 6. Assuming there exists a constitutional principle that mandates the defeat of a bill where representatives of constituents of more than 33.33% of the County oppose its passage, Local Law No. 6 falls short of this by a mere fractional .03%: as stated above, any combination of representatives whose towns have more than 33.36% of the County population can always defeat two-thirds majority issues. Deviations much greater than this, however, have been held to be consistent with constitutional standards. Indeed, in one instance, the New York Court of Appeals upheld a deviation of 7.3%.[43] These matters cannot be determined with mathematical exactitude or the fine balance of an apothecary's scale. The flexibility which is to be afforded municipal government schemes has been repeatedly stressed,[44] and there can be no question that New York's public policy to "maintain municipal boundary lines in the [apportionment] of counties for representation purposes"[45] is a "legitimate consideration"[46] supporting a deviation from absolute mathematical precision.

In conclusion, the Haas complaint is dismissed. The Court grants the plaintiffs' motion in the Greenwald action to the ex-

tent that the County is to take the affirmative steps outlined above as regards the exclusion of persons in computing the number of "residents" for apportionment purposes. In all other respects, the defendants' motion is granted. As per the request of the Greenwald plaintiffs, the current apportionment scheme shall remain in effect until the County completes the re-evaluation of population data, which it shall endeavor to do with deliberate speed.

So ordered.

**43.** *Franklin v. Krause,* 32 N.Y.2d 234, 344 N.Y.S.2d 885, 298 N.E.2d 68 (1973), *app. dismissed,* 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974). *See also Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

**44.** In *Abate v. Mundt,* 403 U.S. 182, 185, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399 (1971), for example, the Court noted that "[i]n assessing the constitutionality of various apportionment plans, we have observed that viable local governments may need considerable flexibility in municipal arrangements if they are to meet changing societal needs ..., and that a desire to preserve the integrity of political subdivisions may justify an apportionment plan which departs from numerical equality." (*citing Sailors v. Board of Educ.,* 387 U.S. 105, 110–11, 87 S.Ct. 1549, 1553, 18 L.Ed.2d 650 (1976); *Reynolds v. Sims,* 377 U.S. 533, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964)). *See also Karcher v. Daggett,* —— U.S. ——, ——, 103 S.Ct. 2653, 2658, 77 L.Ed.2d 133 (1983).

**45.** *Jones v. Board of Supervisors,* 46 A.D.2d 102, 361 N.Y.S.2d 718, 720–21 (3d Dep't 1974) (citations omitted). *Accord Abate v. Mundt,* 25 N.Y.2d 309, 316, 305 N.Y.S.2d 465, 469, 253 N.E.2d 189, 192 (1969), *aff'd,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971).

**46.** *Reynolds v. Sims,* 377 U.S. 533, 579, 84 S.Ct. 1362, 1391, 12 L.Ed.2d 506 (1964) ("So long as the divergencies from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible."). *See also Abate v. Mundt,* 403 U.S. 182, 185, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399 (1971) ("deviations from population equality must be justified by legitimate state considerations") (*citing Swann v. Adams,* 385 U.S. 440, 444, 87 S.Ct. 569, 572, 17 L.Ed.2d 501 (1967)). *See also Karcher v. Daggett,* —— U.S. ——, ——, 103 S.Ct. 2653, 2663–64, 77 L.Ed.2d 133 (1983) (legitimate considerations justifying variance from absolute equality in legislative districts include "respecting municipal boundaries").