737 F.2d 155
 The LEAGUE OF WOMEN VOTERS OF NASSAU COUNTY, Carol Carlton,
Judith Schmertz, Barbara Josepher, Adele Fox and
Ann Borner, Plaintiffs-Appellants,
v.
NASSAU COUNTY BOARD OF SUPERVISORS, Thomas Gulotta, as
Presiding Supervisor of Town of Hempstead, James Bennett, as
Supervisor of Town of Hempstead, John Kiernan, as Supervisor
of Town of North Hempstead, Hannah Komanoff, as Supervisor
of City of Long Beach, Joseph Colby, as Supervisor of the
Town of Oyster Bay, and Alan Parente, as Mayor-Supervisor of
City of Glen Cove, Defendants-Appellees.
 No. 326, Docket 83-7602.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 18, 1983.
Decided May 22, 1984.
 
 1
 Charles Robert, Robert & Schneider, Hempstead, N.Y., for plaintiffs-appellants.
 
 
 2
 Donald J. Werner, Curtis, Hart & Zaklukiewicz, Merrick, N.Y., for defendants-appellees.
 
 
 3
 Before OAKES and MESKILL, Circuit Judges, and NEAHER, District Judge.*
 
 NEAHER, District Judge:
 
 4
 Plaintiffs, the League of Women Voters ("League") and five members, appeal from a judgment of the United States District Court for the Eastern District of New York, Jacob Mishler, Judge. Plaintiffs had sued the Nassau County Board of Supervisors ("Board") and its six member supervisors, charging that Nassau County Local Law 2-1982, which reapportioned the Board's weighted voting system after the 1980 census, violated the equal protection clause of the fourteenth amendment to the United States Constitution. After rejecting that constitutional challenge, Judge Mishler granted defendants' motion for summary judgment and dismissed the complaint.
 
 
 5
 While agreeing with that disposition, we find that it was unnecessary to reach plaintiffs' equal protection argument because, aside from one meritless issue, this case is controlled by the Supreme Court's earlier decision in Franklin v. Krause, 32 N.Y.2d 234, 344 N.Y.S.2d 885, 298 N.E.2d 68 (1973), appeal dismissed, 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974). Accordingly, we affirm but on the basis of that prior Supreme Court summary adjudication.
 
 FACTS
 
 6
 New York State's Nassau County is governed by the Board, whose six members are the chief executives of the cities of Glen Cove and Long Beach, and the Towns of Hempstead, Oyster Bay and North Hempstead.[1] Since 1917, the Board has used a weighted voting system,[2] which has been the subject of other litigation.
 
 
 7
 In Franklin v. Mandeville, 26 N.Y.2d 65, 308 N.Y.S.2d 375, 256 N.E.2d 534 (1970), a case early in reapportionment jurisprudence, the Board's weighted voting plan was also attacked as unconstitutional. Then, as now, despite having a majority of Nassau County's population, the Town of Hempstead was assigned less than a majority of the weighted vote. The New York Court of Appeals held that that allotment violated equal protection.
 
 
 8
 "[T]he Town of Hempstead's population constituted 57.12% of the county's population but that town's representatives may cast but 49.6% of the board's vote. Important as is ... the present inequality, it is of even greater moment that inequality in some degree is mandated and, indeed, perpetuated by the charter provision: 'nor shall the supervisor or supervisors of any town or city be entitled to cast more than fifty per centum of the total vote of said board.' (L.1936, ch. 879, Sec. 104, subd. 2.) This provision ... clearly violates the one man, one vote principle.... Not only are the Hempstead Supervisors presently barred from ... a majority vote, but section 104 would continue to deprive them, or the residents of any other town or city subsequently containing a majority of the county population, from majority representation, ..."
 
 
 9
 Id. at 377, 256 N.E.2d 534.
 
 
 10
 Notwithstanding that illegality, the New York Court of Appeals permitted the weighted voting system to continue until after the 1970 census, so that the new reapportionment plan would be accurately based. A computer analysis was performed, but yet another weighted voting system was proposed. That proposal was contained in Nassau County Local Law 13-1972 ("Local Law 13-1972") to amend Nassau Government Law Sec. 104 ("Sec. 104").
 
 
 11
 Outlining the provisions of Local Law 13-1972, one court during the period stated:
 
 
 12
 "The new plan ... is embodied in Local Law No. 13-1972. It continues a structure of town and city Supervisors sitting as Board members, the mandatory decennial reallocation of votes and use of a weighted voting system....
 
 
 13
 "In fixing the standards for allocating votes, the new law provides that the 'voting power' of a Supervisor shall be measured 'by the mathematical possibility of his casting a decisive vote on a particular matter.' It then equates a town's or city's 'voting power' with that of its Supervisor, or, in the case of Hempstead, with the total voting power of its two Supervisors.
 
 
 14
 "Furthermore, the percentages of voting power 'shall approximate' the corresponding percentages of population and it further guarantees that no town or city shall be wholly without voting power.
 
 
 15
 "Finally, ... the new plan requires that in preparing each reapportionment ... [the] Board shall employ 'an independent computerized mathematical analysis' and any other methods which shall 'most nearly analyze' the percentages of voting power and population.
 
 
 16
 "Paragraph 5 of the new law turns from general standards to specific allocation of votes based upon the 1970 census data."
 
 
 17
 Franklin v. Krause, 72 Misc.2d 104, 338 N.Y.S.2d 561, 563 (N.Y.Sup.Ct.1972), rev'd, 32 N.Y.2d 234, 344 N.Y.S.2d 885, 298 N.E.2d 68 (1973), appeal dismissed, 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974).[3]
 
 The referred-to paragraph five provided:
 
 18
 "Based on the nineteen hundred seventy federal census the number of votes in each of the following categories is ... fixed as follows:
 
 
 19
 "a. For matters requiring a majority of the voting strength of the board of supervisors or a majority of the total voting power of the board of supervisors:
 
 
 20
 "(1) Total number of votes .............. 130
"(2) Distribution of votes
 Presiding Supervisor of Hempstead .. 35
 Supervisor of Hempstead ............ 35
 Supervisor of Oyster Bay ........... 32
 Supervisor of North Hempstead ...... 23
 Supervisor of Long Beach ........... 3
 Supervisor of Glen Cove ............ 2
"(3) Votes required for passage ......... 71"[4]
 
 
 21
 That allocation resulted in the following deviations:
 
 
 22
 Percent
 Percent of Voting
Municipality Population Population Power Deviation
Hempstead 801,592 56.2 54.6 -1.6
Oyster Bay 333,342 23.1 20.4 -2.7
No. Hempstead 235,007 16.5 13.0 -3.5
Long Beach 33,127 2.3 5.6 k3.3
Glen Cove 25,770 1.8 5.6 k3.8
 ----------
 TOTAL 1,428,838
 
 
 23
 The maximum range of deviation was 7.3%, i.e., North Hempstead's -3.5% computed with Glen Cove's + 3.8%.[5]
 
 
 24
 Importantly, Local Law 13-1972 still left the Town of Hempstead without a majority of the votes (having 70 when 71 was needed), despite the New York Court of Appeals' clear statement in Franklin v. Mandeville, 308 N.Y.S.2d at 377, 256 N.E.2d 534. Not suprisingly, the new plan was challenged as constitutionally deficient.
 
 
 25
 In a conceded turnabout, the New York Court of Appeals in Franklin v. Krause, 32 N.Y.2d 234, 344 N.Y.S.2d 885, 892, 298 N.E.2d 68 (1973), held that the weighted voting system under Local Law 13-1972 had "no constitutional infirmity." In reaching that decision, the Court of Appeals acknowledged and endorsed the evolution of reapportionment law, especially in regard to local government.
 
 
 26
 "[W]hile the Town of Hempstead Supervisors together possess 70 votes, more than a majority of the total 130, they cannot have 55% voting power which would ordinarily be 100% voting power in a 'pure majority' situation. This admittedly artificial voting requirement ... gives the Town of Hempstead a greater disenfranchisement than ... in certain voting combinations.
 
 
 27
 "This is precisely the point which caused our rejection of the former plan .... At the time that decision was handed down, the preachment was that one man, one vote had to be applied at all levels of government with mathematical certitude and this court was concerned with the scope of Hempstead's disenfranchisement. In the intervening years this stricture has been considerably softened with respect to local level government and this reshaping is most desirable, as demonstrated in the case at bar."
 
 
 28
 Id. at 888, 298 N.E.2d 68.
 
 
 29
 The Franklin v. Krause plaintiffs, with the League intervening, appealed to the Supreme Court. Before doing so, however, they moved to amend the remittitur. The New York Court of Appeals granted the motion, thereby clarifying that the constitutionality of Local Law 13-1972 had indeed been decided.
 
 
 30
 "[T]here were presented, and necessarily passed upon, questions arising under the Constitution of the United States, viz: (1) whether Local Law No. 13-1972 of Nassau County is unconstitutional because it deprives plaintiffs of the equal protection of the laws as well as due process of law ...; and (2) whether said Local Law, because it utilizes weighted voting, is unconstitutional per se in that it violates the plaintiffs' right to equal protection of the laws and to due process of law .... The Court of Appeals held there was no violation of any of plaintiffs' constitutional rights."
 
 
 31
 Franklin v. Krause, 33 N.Y.2d 646, 348 N.Y.S.2d 554, 303 N.E.2d 71 (1973).
 
 
 32
 The Supreme Court received the case under its mandatory appellate jurisdiction, 28 U.S.C. Sec. 1257(2), but dismissed for want of a substantial federal question. Franklin v. Krause, 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974). Thus, the constitutional gauntlet of Nassau County's weighted voting system was evidently ended, and the provisions of Local Law 13-1972 became effective on January 1, 1976 as part of Sec. 104.[6]
 
 
 33
 The constitutional calm was brief. Section 104(3) provides:
 
 
 34
 "In accordance with ... subdivision four ..., the board of supervisors shall, not later than six months after the publication of the results of each federal decennial census by appropriate amendment to subdivision five ..., propose a reapportionment of the voting power...."
 
 And Sec. 104(4) states:
 
 35
 "g. The percentage of voting power of each town and city ... shall approximate the town's or city's percentage of the total county population.
 
 
 36
 "h. In preparing each reapportionment, the board of supervisors shall employ an independent computerized mathematical analysis and such other ... methods as shall most nearly equalize the percentage of voting power of each town and city to its percentage of the total county population."
 
 
 37
 As required by those provisions, after the 1980 census and a computer analysis, the Board was to be reapportioned by an amendment to Sec. 104(5). The amendment eventually enacted was Nassau County Local Law 2-1982 ("Local Law 2-1982")--ostensibly, the focus of this lawsuit. Except for mathematical adjustments reflecting Nassau County's population changes since the 1970 census, Local Law 2-1982 is a verbatim version of Sec. 104(5) as originally embodied in paragraph five, supra, of Local Law 13-1972.
 
 
 38
 "Based on the nineteen hundred eighty federal census, the number of votes in each of the following categories is ... fixed as follows:
 
 
 39
 "a) For matters requiring a majority of the voting strength of the board of supervisors or a majority of the voting power of the board of supervisors:
 
 
 40
 "(1) Total number of votes .............. 108
"(2) Distribution of votes
 Presiding Supervisor of Hempstead .. 30
 Supervisor of Hempstead ............ 28
 Supervisor of Oyster Bay ........... 22
 Supervisor of North Hempstead ...... 15
 Supervisor of Long Beach ........... 7
 Supervisor of Glen Cove ............ 6
"(3) Votes required for passage ......... 65"[7]
 
 
 41
 This allocation results in the following deviations:
 
 
 42
 Percent
 Percent of Voting
Municipality Population Population Power Deviation
Hempstead 738,517 55.92 53.85 -2.07
Oyster Bay 305,750 23.12 21.15 -1.97
No. Hempstead 218,624 16.53 17.31 k .78
Long Beach 34,073 2.58 5.77 k3.19
Glen Cove 24,618 1.86 1.92 k .06"[8]
 ----------
 TOTAL 1,321,582
 
 
 43
 As seen, due to Nassau County's population decrease, the total votes are reduced to 108. Once again and (now) pursuant to Sec. 104(4)(g)-(h), supra, the municipalities are assigned votes proportionate to their respective populations. Still, the Town of Hempstead is denied a majority.[9]
 
 
 44
 Significantly, the maximum range of deviation under Local Law 2-1982 of 5.26% (the Town of Hempstead's -2.07% computed with Long Beach's + 3.19%) is less than the 7.3% under Local Law 13-1982. But, that diminished disparity and the numerical vote allotment are the only differences between Local Law 2-1982 and its predecessor--paragraph 5 of Local Law 13-1972.
 
 
 45
 In any event, Local Law 2-1982 was submitted to the Board, which after public hearings, adopted it on March 8, 1982. Nassau County's Chief Executive signed it on the same day, and, after being approved in a referendum, Local Law 2-1982 became effective on January 1, 1983. Prior to that referendum, however, plaintiffs had filed this lawsuit seeking unsuccessfully to enjoin it. Thus Nassau County's weighted voting plan is again under constitutional attack--this time through the enactment of Local Law 2-1972.[10]
 
 DISCUSSION
 A. Standing
 
 46
 Plaintiffs have brought this suit under 42 U.S.C. Sec. 1983 through its legislative implementation, 28 U.S.C. Sec. 1343(3). Defendants correctly maintain that the League does not have standing to assert the rights of its members.[11] This Circuit has restricted organizational standing under Sec. 1983 by interpreting the rights it secures to be personal to those purportedly injured. Aguayo v. Richardson, 473 F.2d 1090 (2d Cir.1974), cert. denied, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974). As we there pointed out:
 
 
 47
 "Neither [the] language nor the history ... [of Sec. 1983] suggests that an organization may sue under the Civil Rights Act for the violations of rights of members."Id. at 1099. See also Albany Welfare Rights Organization v. Wyman, 493 F.2d 1319, 1321-22 (2d Cir.1974) (A welfare rights organization had standing under Sec. 1983 because the asserted injury was to the right of association, an avenue left open in Aguayo ); Warth v.Seldin, 495 F.2d 1187, 1194 (2d Cir.1974); aff'd on other grounds, 422 U.S. 490, 516-17, 95 S.Ct. 2197, 2214, 45 L.Ed.2d 343 (1975) (In denying standing to a housing organization, this court added, "It is highly doubtful that an organization has standing to represent its members in most cases under the Civil Rights Act.").
 
 
 48
 Necessarily, we adhere to our prior decisions and, consequently, hold that the League lacks standing under Sec. 1983, the only jurisdictional basis asserted.[12]
 
 
 49
 Defendants are similarly correct in contending that plaintiffs Carlton, Fox and Borner, who live in Long Beach, North Hempstead and Glen Cove, respectively, lack standing, as well. These voters reside in overrepresented municipalities, i.e., political subdivisions that have percentages of the Board's voting power greater than their percentages of Nassau County's population. Hence, as voters from overrepresented municipalities, these plaintiffs cannot claim any injury.
 
 
 50
 The issue whether plaintiffs such as these have standing was addressed in Fairley v. Patterson, 493 F.2d 598 (5th Cir.1974). There, the Fifth Circuit held that the plaintiffs, who had not alleged that they resided in underrepresented voting districts, lacked standing to contest a reapportionment law. Id. at 604. In so holding, the Fifth Circuit stated:
 
 
 51
 "Under appellants' first claim, a traditional one man, one vote argument, the Supreme Court has conclusively established in Baker v. Carr, 369 U.S. 186, 204-208 [82 S.Ct. 691, 703-705, 7 L.Ed.2d 663] ... (1962), and Reynolds v. Sims, 377 U.S. 533, 554-561, [84 S.Ct. 1362, 1377-1381, 12 L.Ed.2d 506] ... (1964), that sufficient damage through underrepresentation to obtain standing will be inflicted if population equality among voting units is not present. However, injury results only to those persons domiciled in the underrepresented voting districts."
 
 
 52
 Id. at 603 (emphasis in original) (footnote omitted). Cf. Minority Police Officers Association of South Bend v. City of South Bend, 721 F.2d 197, 202 (7th Cir.1983) (in a Sec. 1983 case for alleged hiring discrimination, minority police officers, "who [were] all employees, [could not] represent ... unsuccessful applicants, all of whom [were] by definition nonemployees.") (citing Fairley ).
 
 
 53
 Fairley aside, plaintiffs again invoke Baker v. Carr, 369 U.S. at 208, 82 S.Ct. at 705, as authority for standing generally in reapportionment suits. However, as the just-quoted passage in Fairley indicates, plaintiffs' reliance on Baker v. Carr stems from less than a close reading of that case. In contrast to the municipalities in which Carlton, Fox and Borner dwell, the Baker v.Carr voter appellants lived in underrepresented areas.
 
 
 54
 "The injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-a-vis voters in irrationally favored counties."
 
 
 55
 Id. at 207-08, 82 S.Ct. at 704-705.
 
 
 56
 Notably, the Supreme Court explicitly declined to decide whether overrepresented voters had standing.
 
 
 57
 "The complaint also contains an averment that the appellants sue 'on their own behalf and on behalf of all other voters in the State of Tennessee.' ... This may be read to assert a claim that voters in counties allegedly over-represented in the General Assembly also have standing to complain. But it is not necessary to decide that question in this case."
 
 
 58
 Id. at 205 n. 24, 82 S.Ct. at 703 n. 24 (emphasis in original). In brief, plaintiffs' summoning of Baker v. Carr is to no avail. See L. Tribe, American Constitutional Law 87 n. 40 (1978) ("The Court [in Baker v. Carr ] found it unnecessary to decide whether [overrepresented voters had standing] .... Under the theory that limits standing to cases where the litigant's own material interests are adversely affected, such voters quite plainly would not have standing.") (emphasis in original).
 
 
 59
 Independent of Baker v. Carr 's nonsupport, we agree with the Fifth Circuit. Therefore, Carlton, Fox and Borner, who are not "persons domiciled in underrepresented voting districts," lack standing to prosecute this appeal. Fairly v. Patterson, 493 F.2d at 603 (emphasis in original).
 
 
 60
 Defendants, nevertheless, do not contest the standing of Schmertz, a Town of Hempstead resident, and Josepher, an Oyster Bay resident. Those plaintiffs live in underrepresented municipalities, i.e., political subdivisions that have percentages of the Board's voting power less than their percentages of Nassau County's population.
 
 
 61
 That being so, Schmertz and Josepher have seemingly incurred injury. The inquiry on appeal, then, will proceed only as to them. See Baker v. Carr, 369 U.S. at 206, 82 S.Ct. at 704. ("[V]oters who allege facts showing disadvantage to themselves have standing to sue.") (construing Colegrove v. Greene, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946)) (footnote omitted).
 
 B. Substantial Federal Question
 
 62
 As previously noted, except for the numerical reassignment of votes and the lessened disparity, Local Law 2-1982 is identical in fact and in effect to its Local Law 13-1972 counterpart, paragraph 5. Undeterred by that semblance as well as Local Law 2-1982's limited, mechanistic changes, plaintiffs challenge Nassau County's weighted voting system as a whole.
 
 
 63
 Plaintiffs' litigation strategy aside, defendants argue that the Supreme Court's summary adjudication in Franklin v. Krause, 32 N.Y.2d 234, 344 N.Y.S.2d 885, 298 N.E.2d 68 (1973), appeal dismissed, 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974), which upheld Nassau County's weighted voting system as a whole under the comprehensive Local Law 13-1972, is dispositive of the present suit. We agree. The Supreme Court's dismissal for lack of a substantial federal question then is binding now.
 
 
 64
 In Hicks v. Miranda, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), the Supreme Court clarified the import of its summary adjudications on later lower court decisions. There, a three-judge court had declared a State obscenity statute unconstitutionally vague. In doing so, the three-judge court had not deemed controlling an earlier State decision holding the statute valid--although the Supreme Court had dismissed the appeal from that State case for lack of a substantial federal question. Miller v. California, 418 U.S. 915, 94 S.Ct. 3206, 41 L.Ed.2d 1158 (1974) ("Miller II ").
 
 
 65
 In reversing the three-judge court, the Supreme Court outlined the rationale underlying such a dismissal along with the deference it should have been accorded.
 
 
 66
 "That case was an appeal from a decision by a state court upholding a state statute against federal constitutional attack. A federal constitutional issue was properly presented, it was within our appellate jurisdiction under 28 U.S.C. Sec. 1257(2), and we had no discretion to refuse adjudication of the case on its merits .... We are not obligated to grant the case plenary consideration, and we did not; but we were required to deal with its merits. We did so by concluding that the appeal should be dismissed because the constitutional challenge to the [state] statute was not a substantial one. The three-judge court was not free to disregard this pronouncement."
 
 
 67
 Hicks v. Miranda, 422 U.S. at 343-44, 95 S.Ct. at 2288-89.
 
 
 68
 Later, in a footnote, the Supreme Court checked the potential expanse of its language.
 
 
 69
 "Of course, Miller II would have been decisive here only if the issues in Miller II and the present case were sufficiently the same that Miller II was a controlling precedent. Thus, had the District Court considered itself bound by summary dismissals of appeals by this Court, its initial task would have been to ascertain what issues had been properly presented in Miller II and declared by this Court to be without substance. Ascertaining the reach and content of summary actions may itself present issues of real substance,...."
 
 
 70
 Id. at 345 n. 14, 95 S.Ct. at 2290 n. 14 (emphasis added). See Note, "The Precedential Effect of Summary Affirmances and Dismissals for Want of a Substantial Federal Question by the Supreme Court After Hicks v. Miranda and Mandel v. Bradley," 64 Va.L.Rev. 117, 122-23 (1978) ("Note, 'Precedential Effect' ") ("That footnote, rather than the sweeping words of the text, is the most informative passage in Hicks. The text announces the general principle; the note describes the limits of its reach. Only footnote fourteen states clearly that the precedential value of a summary disposition by the Supreme Court extends to a limited range of issues.").
 
 
 71
 The Supreme Court further illuminated the parameters of such dispositions in Mandel v. Bradley, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1976). There, an independent candidate for a federal office challenged a Maryland statute requiring all independents desiring placement on the general election ballot to file a certificate of candidacy 70 days before the party primaries, in addition to signatures of 3% of the voters. Relying on a summary affirmance in Tucker v. Salera, 399 F.Supp. 1258 (E.D.Pa.1975), aff'd, 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976) ("Salera "), which had declared another State's early filing statute unconstitutional, the three-judge court held that the Maryland statute, in like manner, was unconstitutional.
 
 
 72
 Vacating and remanding, the Supreme Court perceived the facts in Salera to be "very different" from those before the three-judge court. Mandel v. Bradley, 432 U.S. at 177, 97 S.Ct. at 2241. In Salera, besides an early filing date, the signatures had to be obtained during a 21-day period. The Supreme Court concluded:
 
 
 73
 "This combination of an early filing deadline and the 21-day limitation on signature gathering is sufficient to distinguish Salera from the case now before us, where there is no limitation on the period within which such signatures must be gathered. In short, Salera did not mandate the result reached by the District Court in this case."
 
 
 74
 Id.
 
 
 75
 Before reaching that conclusion, the Supreme Court gathered the law on summary adjudications and, while doing so, underscored the tasks of lower courts.
 
 
 76
 "The District Court erred in believing that our affirmance in Salera adopted the reasoning as well as the judgment of the three-judge court in that case.... Hicks v. Miranda ... held that lower courts are bound by summary actions on the merits by this Court, but we noted that '[a]scertaining the reach and content of summary actions may itself present issues of real substance.' Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below.
 
 
 77
 'When we summarily affirm, without opinion, ... we affirm the judgment but not necessarily the reasoning by which it was reached. An unexplicated summary affirmance settles the issues for the parties, and is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument.' (Footnote omitted.) Fusari v. Steinberg, 419 U.S. 379, 391-392, 95 S.Ct. 533, 540-41, 42 L.Ed.2d 521 (1975) (Burger, C.J., concurring).
 
 
 78
 "Summary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from. They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions.... Summary actions ... should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved."
 
 
 79
 Id. at 176, 97 S.Ct. at 2240 (emphasis added).
 
 
 80
 Read together, then, as Hicks mentioned but Mandel brought to the fore, this Court's responsibility in gauging Franklin v. Krause's authority over the present case is to mark out the "reach and content" of that prior disposition. See Delta Air Lines, Inc. v. Kramarsky, 650 F.2d 1287, 1295 (2d Cir.1981), aff'd in part and vacated in part, 666 F.2d 21 (1981), aff'd in part, vacated in part and remanded sub nom. Shaw v. Delta Air Lines, Inc., --- U.S. ----, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) ("In attempting to apply the rule resulting from ... a summary decision ... lower courts must undertake a careful analysis of the precise 'reach and content' of the Supreme Court's action.") (citing Mandel and Hicks ). See generally Note, "Precedential Effect," supra, 61 Va.L.Rev. at 141 ("In Hicks the directive to consider carefully the 'reach and content' of the earlier decision, and to determine 'what issues had been properly presented ...' had been banished to a footnote. In Mandel, it became the focal point ....").
 
 
 81
 1. A Comparison of Questions and Issues Presented
 
 
 82
 At the time of Franklin v. Krause, Sup.Ct.R. 15(1)(c) related:
 
 
 83
 "The statement of a question presented will be deemed to include every subsidiary question fairly comprised therein. Only the questions set forth in the jurisdictional statement or fairly comprised therein will be considered by the court."
 
 
 84
 28 U.S.C.A.Sup.Ct.Rs. (1977) (emphasis added).[13]
 
 
 85
 In accordance with that rule, the Franklin v. Krause plaintiffs offered these "Questions Presented":
 
 
 86
 "1. Whether weighted voting is unconstitutional per se as a plan of permanent apportionment for a unicameral, County legislative body having general governmental powers.
 
 
 87
 "2. Whether a plan of apportionment for a County legislative body having general governmental powers constitutionally may prevent the representatives of one local unit (Town of Hempstead) containing more than 57% of the County population, from casting sufficient votes to pass legislative measures requiring a simple majority vote.
 
 
 88
 "3. Whether a plan of apportionment for a County legislative body having general governmental powers constitutionally may create an artificial "majority" requirement so that elected representatives of 57% of the County population do not hold sufficient votes to pass legislative measures requiring a simple majority vote."
 
 
 89
 Appellants' Jur.St. at 3, App. at 293.
 
 
 90
 Before this court, plaintiffs offer the following "Issues Presented for Review":
 
 
 91
 "1. Did the lower Court err by not holding evidentiary hearings from which to make specific findings of fact?
 
 
 92
 "2. Is computerized weighted voting using the Banzhaf weighted voting power methodology unconstitutional per se?
 
 
 93
 "3. Was the percentage point deviation test used by the lower Court, the correct mathematical test to use to review the reapportionment plan?
 
 
 94
 "4. Is there an impermissible built-in bias in the Nassau plan?
 
 
 95
 "5. Is computerized weighted voting in a local legislative body with general governmental powers unconstitutional per se?"
 
 
 96
 Pl.Br. at 2.
 
 
 97
 a. Issue 1: Evidentiary Hearing
 
 
 98
 Decidedly, Issue 1 here was not before the Supreme Court. Nor for that matter was it before Judge Mishler--at least with any consistency. Initially, plaintiffs sought an evidentiary hearing. See, e.g., Aff. p 22, App. at 36 ("[A] hearing is requested ... for the proponents of the Nassau County plan to carry their burden."). Yet, plaintiffs later cross-moved for summary judgment stating that "there are [sic] no dispute in facts, but rather, interpretations of mathematics and applicable law which does not require this Court to hold a trial."). Aff. p 24, App. at 337.
 
 
 99
 Notwithstanding that certitude, plaintiffs' position sharply changed again--after Judge Mishler's May 18, 1983 decision. Purportedly, Morris v. Board of Estimate, 707 F.2d 686 (2d Cir.1983), which had been issued on May 16, 1983, dictated that turnaround. In a motion pursuant to Fed.R.Civ.Pro. 60(b)(6), plaintiffs enumerated the contested facts suddenly necessitating a trial.
 
 
 100
 "[P]laintiffs respectfully request that their motion for relief from judgment ... be granted and this matter be set down for a trial ... for the Court to determine the findings of fact per the holding of Morris v. Board of Estimate."
 
 
 101
 Aff., App. at 379.
 
 
 102
 Despite misgivings about Issue 1's authenticity due to plaintiffs' vacillation, we address it but find Morris not mandating a trial in this case. There, after holding that the one person, one vote rule applied to the Board of Estimate, the Morris court stated:
 
 
 103
 "Because the district court found the one person, one vote rule inapplicable, no findings were made concerning the level of malapportionment, the weight of the state interests alleged to justify whatever level of deviation exists or whether the combination of at-large and local seats, in the context of the voting procedures of the Board, creates a system of representation that satisfies constitutional standards for instruments of local government. It is therefore proper to remand the case to the district court so that it can make such findings.
 
 
 104
 "Upon remand, the district court must determine the degree of malapportionment present (after deciding on the appropriate methodology for doing so) and rule on the policies and interests which the Supreme Court has held may justify deviations from the literal one person, one vote formula."
 
 
 105
 Morris v. Board of Estimate, 707 F.2d at 690 (footnote omitted).
 
 
 106
 Nowhere does Morris direct a hearing. To the contrary, Morris leaves that determination to the considered discretion of the district court who "may find it desirable to amplify the record." Id. at 691 (emphasis added). Further, even were the district court to deem amplification warranted, additional submissions might be sufficient, depending on--as in most suits--what issues require development. In any event, Morris simply does not stand for the principal proposition asserted.
 
 
 107
 Apart from that misinterpretation, Morris is distinguishable on its face. In that case, as mentioned, the district court had determined that the one person, one vote rule did not apply to the Board of Estimate and, consequently, had not made certain findings. Here, however, that rule's relevance was never contested. In addition, the appropriate findings were made.
 
 
 108
 For example, Judge Mishler accepted the malapportionment level as 5.26%, Mem.Dec. at 6, App. at 359, and, thereby, pointedly rejected plaintiffs' mathematics.
 
 
 109
 "According to plaintiffs, their approach is the proper mathematic method for testing a weighted voting plan under Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, ... (1964). We find no such suggestion in Reynolds."
 
 
 110
 Id. at 8 and 361, respectively.
 
 
 111
 Judge Mishler, likewise, did the required weighing between the equal protection guarantee and the proffered governmental policies.
 
 
 112
 "We find that the plan for the apportionment of votes on the Nassau County Board of Supervisors, contained in Local Law 2-1982, is an adequate compromise between the constitutional one man, one vote requirement and the County's interest in preserving existing subdivision lines and the existing legislative structure."
 
 
 113
 Id. at 12 and 365, respectively. See generally R. Dixon, Democratic Representation--Reapportionment in Law and Politics 518 (1968) ("Arithmetically viewed, weighted ... voting [is] in line with the Supreme Court's announced goal [in Reynolds v. Sims, 377 U.S. at 579, 84 S.Ct. at 1390] of 'substantial equality of population'; moreover, [it] achieve[s] this while maintaining concern for the Court's corollary interest in 'integrity of various political subdivisions.' [Id. at 578, 84 S.Ct. at 1390].").
 
 
 114
 To conclude the Morris discussion, while not directing a hearing as a matter of course, it does instruct that certain findings be made when the one person, one vote rule is operative. In this case, having made those findings, the district court complied with Morris.
 
 
 115
 Besides Morris, plaintiffs also contend that Karcher v. Daggett, --- U.S. ----, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), and Brown v. Thomson, --- U.S. ----, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), companion cases also decided after Judge Mishler's opinion, similarly require a hearing. The court disagrees, too, with that interpretation of those cases.
 
 
 116
 In Karcher, the Supreme Court invalidated a New Jersey congressional redistricting plan with a deviation of less than 1% because, though small, that disparity was not due to a good faith effort towards population equality. Karcher v. Daggett, --- U.S. at ----, 103 S.Ct. at 2665.
 
 
 117
 Brown, on the other hand, upheld a Wyoming statute permitting each county to have at least one member in the State house of representatives, despite a resultant 89% maximum deviation. The Supreme Court approved the apportionment because Wyoming had a longstanding, legitimate policy of providing each county with a representative and because the deviation issue had been removed from the Supreme Court's scrutiny. Brown v. Thomson, --- U.S. at ----, 103 S.Ct. at 2698-99.
 
 
 118
 Like Morris, neither Karcher nor Brown commands that evidentiary hearings automatically be held. In fact, the lower court's "hearing" in Karcher was, at the most, a pro forma proceeding, the case being taken essentially on submission. The Supreme Court described that proceeding:
 
 
 119
 "The District Court held a hearing ... at which the parties submitted a number of depositions and affidavits, moved for summary judgment, and waived their right to introduce further evidence in the event the motions for summary judgment were denied."
 
 
 120
 Karcher v. Daggett, --- U.S. at ----, 103 S.Ct. at 2657. So, the Karcher hearing did not differ markedly from the usual summary judgment procedure employed here. In neither instance was live testimony received.
 
 
 121
 In sum, those Supreme Court cases do not compel lower courts to hold superfluous evidentiary hearings. Nevertheless, consistent with Morris, they do expect that adequate findings will be made. See Brown v. Thomson, --- U.S. at ----, 103 S.Ct. at 2696 ("As the District Court found, this policy [of preserving county boundaries] has particular force given the particular size and population of the State and the nature of its governmental structure."); Karcher v. Daggett, --- U.S. at ----, 103 S.Ct. at 2665 ("[T]he District Court's findings easily pass the 'clearly erroneous' test."). Once again, that was done in this case.
 
 
 122
 Appending a final point to our Issue 1 resolution, it is not obvious what more could have been adduced at a trial, in light of the past, related litigation and plaintiffs' purposeful thoroughness in pressing their claims in the present case. This observation is confirmed by plaintiffs' announced pre-decisional position that there were no disputed, material facts. Differently stated, had it been incumbent to reach plaintiffs' constitutional arguments, this case would still remain in a summary judgment posture--as all had agreed. In short, the court views plaintiffs' Issue 1 as too infirm to distinguish this case from Franklin v. Krause.
 
 
 123
 b. Issues 2 and 5: Weighted Voting as Unconstitutional Per Se
 
 
 124
 Issues 2 and 5 were included in Franklin v. Krause 's Question 1 and, also, in the remittitur. See Franklin v. Krause, 348 N.Y.S.2d at 554, 303 N.E.2d 71 ("[T]here [was] presented, and ... passed upon ... whether ... Local Law [13-1972], because it utilizes weighted voting, is unconstitutional per se ....") (granting motion to amend the remittitur). The heart of both Issues 2 and 5 is the per se unconstitutionality of the Board's weighted voting system. That was unmistakably Franklin v. Krause 's Question 1 and the Supreme Court's dismissal of it is controlling precedent as to Issues 2 and 5. See Mandel v. Bradley, 432 U.S. at 176, 97 S.Ct. at 2240. See also Wright v. Lane County District Court, 647 F.2d 940, 941 (9th Cir.1981) (Oregon statute upheld prohibiting the unauthorized practice of law in light of the Supreme Court's dismissal of a "nearly identical" challenge to Arizona's unauthorized practice of law statute); Government of the Virgin Islands v. 19.623 Acres of Land, 536 F.2d 566, 570 (3d Cir.1976) (rejecting alleged due process denial in a condemnation dispute, in view of controlling effect of Supreme Court's summary affirmance of a lower court, which had rejected the same argument that certain condemnation situations required notice or a hearing); Sullivan Outdoor Advertising, Inc. v. Illinois, 420 F.Supp. 815, 819 n. 4 (N.D.Ill.1976) ("We have examined the jurisdictional statement ... and are convinced that the supremacy clause issue was squarely before the [Supreme] Court.")
 
 
 125
 c. Issue 4: "Built-in Bias"
 
 
 126
 Although phrased as "built-in bias", Issue 4 is the same "majority without a majority vote" objection raised in Franklin v. Krause 's Questions 2 and 3. Plaintiffs have acknowledged as much.
 
 
 127
 "Except for the Franklin [v. Krause ] decision, no Court, Federal or State, has ever allowed a reapportionment plan where a majority of the voters did not have a majority of the vote. This was the fatal flaw in Franklin [v. Mandeville, 26 N.Y.2d 65, 308 N.Y.S.2d 375, 256 N.E.2d 534 (1970) ] and is the same 'built-in bias' found in the 1980 plan."
 
 
 128
 Pl.Br. at 28.[14] See also Pl.R.Br. at 7 ("The issue presented to the [Supreme] Court was the 'built-in bias' issue.").
 
 
 129
 The Supreme Court's decision on Questions 2 and 3 continues in force and, as a result, we are "not free to disregard [that] prior pronouncement" as it relates to Issue 4. See Hicks v. Miranda, 422 U.S. at 344, 95 S.Ct. at 2289. See also Cervantes v. Guerra, 651 F.2d 974, 981 (5th Cir.1981) ("[W]hen the Supreme Court speaks clearly, we are bound to obey."); Chicago Sheraton Corp. v. Zaban, 593 F.2d 808, 809 (7th Cir.1979), cert. dismissed, 444 U.S. 911, 100 S.Ct. 240, 62 L.Ed.2d 177 (1979) (The Supreme Court's dismissal of "essentially identical" due process claims involving a tax assessment statute in a related, prior State suit was binding precedent.). Cf. McKeesport Area School District v. Pennsylvania, 446 U.S. 970, 971-72, 100 S.Ct. 2953, 2954, 64 L.Ed.2d 831 (1980) (Concurring in an appeal's dismissal, Justice White stated, "The question presented by the jurisdictional statement ... is identically phrased.... Because a ruling of dismissal for want of a substantial federal question is a judgment on the merits ... and because this case presents the same challenge to the same statute ..., the same outcome properly follows ....").
 
 
 130
 d. Issue 3: The Deviation and Its Mathematical Method
 
 
 131
 Issue 3 remains. Plaintiffs assert that the deviation in Franklin v. Krause was actually 232% (and 132.16% now), based upon the true mathematical method.[15] More particularly, plaintiffs posit that the Supreme Court was unaware of what the announced 7.3% deviation in Franklin v. Krause really represented and, concomitantly, misunderstood the method used in computing that figure. Thus they contend:
 
 
 132
 "A careful review of the plaintiffs' jurisdictional statement submitted to the Supreme Court in Franklin v. Krause ... reveals no mention of the 232% deviation. The issue presented to the Court was the 'built-in-bias' issue. Whether by coincidence or intentional design, the Board had created a mathematical deviation of 7.3 percentage points in Franklin v. Krause, which also happened to be roughly equivalent to the 57% figure used to describe the majority population in the Town of Hempstead and the '49% minority voting strength'. Upon information and belief, the United States Supreme Court in a cursory review of the jurisdictional statement may have assumed the '7.3%' figure discussed in Franklin v. Krause was the difference between 57% and 49% and found it within the 11.9% holding of Abate [v. Mundt, 403 U.S. 182, 184, 187, 91 S.Ct. 1904, 1906, 1907, 29 L.Ed.2d 399 (1971) ].
 
 
 133
 Pl.Br. at 7-8 (emphasis in original).
 
 
 134
 Plaintiffs' apparent conclusion from these suppositions is that since the true deviation and measure were not in the Jurisdictional Statement, Franklin v. Krause does not affect Issue 3. See generally Pl.R.Br. at 8 ("[T]o be binding as a precedent, there must have been an application of the judicial mind to the precise question ....").
 
 
 135
 Insofar as the purported 232% deviation and mathematical method are not expressly set forth in the "Questions Presented," plaintiffs are right. Beyond that, plaintiffs' argument fails because its suppositions are fallacious.
 
 
 136
 Plaintiffs' "information and belief" notwithstanding, this court has obtained the complete Franklin v. Krause record from the Supreme Court.[16] Quite plainly, the deviation and what it measured, as well as the underlying mathematical steps, were front and center, as follows:
 
 
 137
 "The number of votes required for passage of a measure requiring a 'majority' vote was fixed at 71, and for a 'two-thirds' measure, at 92. With these mathematical 'givens' ... the computer then calculated first the number of decisive votes each supervisor may cast ..., then the respective percentages of voting power ..., and finally, for comparison purposes, the corresponding percentages of population.... Summarized in the 'majority' plan, the relevant percentages and resulting deviations are as follows:
 
 
 138
 Percentages Percentages
 of of Voting
 Population Power Deviation
"Hempstead (Total) 56.2 54.6 -1.6
Oyster Bay 23.1 20.4 -2.7
North Hempstead 16.5 13.0 -3.5
Long Beach 2.3 5.6 k3.3
Glen Cove 1.8 5.6 k3.8
 
 
 139
 ....
 
 
 140
 "This, then, is the new plan, which produces percentage deviations ranging from -3.5% to + 3.8%, or a total numerical range of 7.3%."
 
 
 141
 Appellee's Br. (Motion to Dismiss) at 10-11, Franklin v. Krause, 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974) (emphasis added) (footnotes omitted).[17] Compare Sup.Ct.R. 16(1)(b) ("The court will receive a motion to dismiss an appeal from a state court on the ground that it does not present a substantial question ....") and Sup.Ct.R. 16(6) ("After consideration of the papers distributed pursuant to this rule, the court will enter the appropriate order."), 28 U.S.C.Sup.Ct.Rs. (1977).[18] See Comment, "The Precedential Weight of a Dismissal by the Supreme Court for Want of a Substantial Federal Question: Some Implications of Hicks v. Miranda," 76 Col.L.Rev. 508, 532 n. 154 (1976) ("Since dismissals are without opinion, a fair determination of the 'reach and content' of a summary dismissal can be had only upon a careful examination of (a) the appellant's jurisdictional statement, (b) the appellee's opposing papers, and (c) the state court's opinion.").
 
 
 142
 Simply stated, the 7.3% could not have been subject to misinterpretation by the Supreme Court due to a "cursory review," as plaintiffs suggest. Rather, that figure and its computation were put directly to the Supreme Court by the prevailing party.
 
 
 143
 Furthermore, that deviation and method were "fairly comprised" within the "Questions Presented," Sup.Ct.R. 15(1)(c), supra, considering the Supreme Court's overriding concern that disparities stay within permissible boundaries.
 
 
 144
 "Our decisions [regarding State and local governments] have established ... that an apportionment plan with a maximum ... deviation under 10% falls within th[e] category of minor deviations. [Citations omitted.] A plan with larger disparities ... creates a prima facie case of discrimination and ... must be justified ...."
 
 
 145
 Brown v. Thomson, --- U.S. at ----, 103 S.Ct. at 2696 (emphasis added).
 
 
 146
 Indeed, the question of deviation from the one person, one vote rule is fundamental in reapportionment litigation. The Supreme Court made this plain in Reynolds v. Sims, 377 U.S. 533, 567, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).
 
 
 147
 "Population is ... the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies."
 
 
 148
 (emphasis added) (footnote omitted). See also Abate v. Mundt, 403 U.S. 182, 185, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399 (1971) ("[E]lectoral apportionment must be based on the general principle of population equality .... [T]his Court has carefully scrutinized state interests offered to justify deviations from population equality."); L. Tribe, American Constitutional Law 743 (1978) ("Even where the one person, one vote principle governs, it remains to be determined how far from precise mathematical equality an apportionment scheme may stray before it violates the Constitution."). Cf. Andrews v. Koch, 528 F.Supp. 246, 252 (1981), aff'd, 688 F.2d 815 (2d Cir.1982), aff'd sub nom. Giacobbe v. Andrews, 459 U.S. 801, 103 S.Ct. 32, 74 L.Ed.2d 46 (1982) ("[T]he question is whether the allocation of an equal number of at-large Council seats to each of the five boroughs, without regard to substantial ... disparities, comports with the constitutional rule of substantial numerical equality....").[19]
 
 
 149
 Given that essentiality in reapportionment litigation of deviation from the one person, one vote rule, the court finds that the 7.3% variance and its computation were at the least "fairly comprised" within the "Questions Presented" in Franklin v. Krause. Sup.Ct.R. 15(1)(c), supra. From that finding, we necessarily conclude that that disparity and its manifest calculation were considered by the Supreme Court and determined to be insubstantial--as were the other questions expressly raised in the Jurisdictional Statement. The "reach and content" of Franklin v. Krause, thereby, extends to Issue 3. Hicks v. Miranda, 422 U.S. at 345 n. 14, 95 S.Ct. at 2281 n. 14. See generally Prettyman v. Nebraska, 537 F.Supp. 712, 715 (D.Neb.1982) (A prior Supreme Court dismissal of a State court decision upholding the constitutionality of Nebraska's education statutes and regulations was binding in a subsequent action involving different parties but the same "issues and arguments."); Bangor Baptist Church v. Maine, 549 F.Supp. 1208, 1219 (D.Maine 1982) ("A summary disposition has precedential value in cases virtually indistinguishable from the case summarily disposed of ... and in cases involving ... slightly different facts and issues ....").
 
 
 150
 Before concluding this deviation and mathematics discussion, however, plaintiffs have advanced another, related argument concerning Issue 3. Although not fully developed, their contention is that the Supreme Court could not have appreciated the method before it, since the simple computation used was applicable to single-member district plans--not a complex weighted voting system. See Brown v. Thomson, --- U.S. at ----, 103 S.Ct. at 2701 ("We have come to establish a rough threshold of 10% maximum deviation ... (adding together the deviations from average district size of the most underrepresented and most overrepresented districts) ....") (Brennan, J., dissenting). See, e.g., White v. Weiser, 412 U.S. 783, 785, 93 S.Ct. 2348, 2350, 37 L.Ed.2d 335 (1973) ("The 13th District exceeded the ideal ... by 2.43% and the 15th District was smaller by 1.7%. [T]heir total percentage deviation was 4.13%.").
 
 
 151
 In plaintiffs' view, the Supreme Court obviously made a mistake, since Franklin v. Krause assertedly does not comport with other reapportionment caselaw. Accordingly, that summary adjudication was an "aberration" and, of necessity, nonbinding. See Pl.R.Br. at 7 ("[T]he Supreme Court decision was based on the same mistake ... that was before the New York ... Court of Appeals. Thus, ... the Franklin v. Krause holding is such an aberration from all other Supreme Court holdings that it cannot be relied upon.").
 
 
 152
 There are two responses. First, the short answer is that, as shown, the Supreme Court knew that a weighted voting system was being measured and by what method.
 
 
 153
 Second, applying that simple method to the Board's weighted voting system was in accord with the Supreme Court's reapportionment jurisprudence then and more so now. Early in its journey through the "political thicket," the Supreme Court recognized that flexibility --not precise mathematical tests--was required when reviewing State and local government representation plans.
 
 
 154
 "[T]he problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating ... a state legislative apportionment scheme...."
 
 
 155
 Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964). See generally Reynolds v. Sims, 377 U.S. at 577, 84 S.Ct. at 1389 ("Mathematical exactness or precision is hardly a workable constitutional requirement.") (footnote omitted); Avery v. Midland, 390 U.S. 474, 485, 88 S.Ct. 1114, 1120, 20 L.Ed.2d 45 (1968) ("The Constitution does not require that a uniform straitjacket bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems.").
 
 
 156
 That early recognition has evolved into a consistent theme.
 
 
 157
 "Neither courts nor legislatures are furnished any specialized calipers that enable them to extract from the general language of the Equal Protection Clause ... the mathematical formula that establishes what range of percentage deviations is permissible, and what is not."
 
 
 158
 Mahan v. Howell, 410 U.S. 315, 329, 93 S.Ct. 979, 987, 35 L.Ed.2d 320 (1973). See also Gaffney v. Cummings, 412 U.S. 735, 749, 93 S.Ct. 2321, 2329, 37 L.Ed.2d 298 (1973) ("An unrealistic overemphasis on raw population figures, a mere nose count ... may submerge ... other considerations and ... furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable ... apportionment ...."); Karcher v. Daggett, --- U.S. at ----, 103 S.Ct. at 2659 ("[W]e have required that absolute population equality be the paramount objective ... only in ... congressional districts....") (emphasis added). Cf. Morris v. Board of Estimate, 707 F.2d at 691 ("So long as the requirements of the Equal Protection Clause are met, each locality is free to develop the system of governance which best accords with its needs."); Greenwald v. Board of Supervisors of County of Sullivan, 567 F.Supp. at 210 ("These matters cannot be determined with mathematical exactitude or the fine balance of an apothecary's scale. The flexibility which is to be afforded municipal government schemes has been repeatedly stressed ....") (footnote omitted).
 
 
 159
 Thus, while deviation from the ideal is a fundamental inquiry in reapportionment disputes, the Supreme Court's review of State and local government legislative plans has been noteworthy for the nonpromulgation of strict mathematical tests. Rather, the theme--especially concerning units of local government--has been flexibility. Based upon that theme, we conclude that the Supreme Court was not only aware of the simple mathematical method used in Franklin v. Krause, but deemed that measure to comport with the flexibility desirable when examining a local government plan.
 
 
 160
 Therefore, despite plaintiffs' intemperate categorization of the Supreme Court's decision in Franklin v. Krause as a nonbinding "aberration," this court believes the contrary. Franklin v. Krause is both binding and aligned with the Supreme Court's reapportionment jurisprudence. As such, Franklin v. Krause resolves Issue 3. Mandel v. Bradley, 432 U.S. at 176, 97 S.Ct. at 2240.
 
 
 161
 Besides Issue 3, Franklin v. Krause, as discussed, resolves Issues 2, 4 and 5, also. In so holding, we are heeding the Supreme Court's instructions, while adhering to the guidance of our prior decisions.
 
 
 162
 "The District Court should have followed the Second Circuit's advice, first, in Port Authority Bondholders Protective Committee v. Port of New York Authority, 387 F.2d 259, 263 n. 3 (1967), that 'unless and until the Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise'; and, later, in Doe v. Hodgson, 478 F.2d 537, 539, cert. denied sub nom. Doe v. Brennan, 414 U.S. 1096, 94 S.Ct. 732, 38 L.Ed.2d 555 (1973), that the lower courts are bound by summary decisions by this Court ' "until such time as the Court informs [them] that [they] are not." ' "
 
 
 163
 Hicks v. Miranda, 422 U.S. at 345-46, 95 S.Ct. at 2289-90 (brackets by Hicks Court). The Supreme Court has not informed us otherwise--either directly or by doctrinal development. Instead, as noted, the Supreme Court's jurisprudence since Franklin v. Krause has continued to underscore the latitude afforded State and local governments. See, e.g., Brown v. Thomson, --- U.S. at ----, 103 S.Ct. at 2698-99. Accordingly, we remain bound by Franklin v. Krause 's "reach and content." Hicks v. Miranda, 422 U.S. at 344-45 & n. 14, 95 S.Ct. at 2289-2290 & n. 14.
 
 
 164
 That result is especially appropriate in this case. As defendants pointedly remark, plaintiffs are attacking "the same legislative body in the same county using the same system of allocating votes." Def.Br. at 21 (emphasis in original). There can be no disagreement with that description. Differences between the two suits are too inadequate to preclude Franklin v. Krause 's precedential effect. In other words, even if no further, Franklin v. Krause extends to this case. See Preston v. Seay, 684 F.2d 172, 173 (1st Cir.1982) (In rejecting a constitutional challenge to a jury trial waiver statute, the court grounded its decision on two prior Supreme Court dismissals of factually different cases attacking the same statute and commented, "It is ... often difficult to understand the proper reach of ... [summary adjudications] ... but ... the precedents here are so close as to be dispositive."). Cf. Barry v. City of New York, 712 F.2d 1554, 1558 (2d Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983) ("We note that the Supreme Court has dismissed for lack of a substantial federal question three appeals from State decisions upholding financial disclosure laws.... [T]he statute challenged in this case, and the issues raised differ in important respects ....").
 
 CONCLUSION
 
 165
 Based upon the preceding analysis, we hold that except for Issue 1, which lacks merit, Franklin v. Krause 's "reach and content" controls this suit. Hicks v. Miranda, 422 U.S. at 345 n. 14, 95 S.Ct. at 2290 n. 14. To hold otherwise would mean that Franklin v. Krause "for practical purposes, [has] no force as precedent." Hawaiian Telephone Co. v. Hawaii, 614 F.2d 1197, 1200 (9th Cir.1980), cert. denied, 446 U.S. 984, 100 S.Ct. 2965, 64 L.Ed.2d 840 (1980).
 
 
 166
 While plaintiffs may desire Franklin v. Krause 's relitigation, we cannot disregard such prior authority. To do so would not only be evading responsibility but fostering causeless litigation, recurring with each census.
 
 
 167
 For the foregoing reasons, we affirm the district court's grant of summary judgment and dismissal of the complaint.
 
 
 
 *
 Of the Eastern District of New York, sitting by designation
 
 
 [1]
 As the most populous political subdivision, the Town of Hempstead actually has two officials--a Presiding Supervisor and a Supervisor--on the Board. See Nassau County Government Law Sec. 104(4)(f), App. at 25
 Note: Besides App. for Appendix, the following abbreviations will be used: Pl. for Plaintiffs; Def. for Defendants; Br. for Brief; R. for Reply; Mem.Dec. for Memorandum Decision and Order; Aff. for Affidavit/Affirmation; and Jur.St. for Jurisdictional Statement.
 
 
 [2]
 Simply defined, weighted voting is
 "a system of representative voting used when the districts which the members represent have unequal numbers .... Theoretically, each member of the legislative body is given a weighted vote to offset the differences in numbers of people represented. Thus, a man representing a large district would be given a greater vote than a man representing a small district."
 Johnson, "An Analysis of Weighted Voting as Used in Reapportionment of County Governments in New York State", 34 Alb.L.Rev. 1, 10 (1969).
 
 
 [3]
 Except for paragraph 5, the record in this case does not contain a copy of Local Law 13-1972, but, as will be seen, its substance eventually became part of Sec. 104. Apparently, due to the delay in ascertaining the constitutionality of Local Law 13-1972, as well as other subsequent delays not relevant here, the actual amendment to Sec. 104 was made by Local Law 5-1975, which seems to have simply been Local Law 13-1972 renumbered. See Legislative History of Sec. 104, App. at 26. See generally Franklin v. Krause, 83 Misc.2d 42, 371 N.Y.S.2d 757 (N.Y.Sup.Ct.1975). Given that identity and that it was the focus of litigation important to this case, we shall refer to Local Law 13-1972 as the immediate predecessor of Local Law 2-1982
 
 
 [4]
 In matters requiring two-thirds of the weighted votes, 92 was the number set for passage
 
 
 [5]
 As later discussed, plaintiffs vigorously dispute these calculations
 Concerning the general computation of deviations, see, e.g., Bickerstaff, "Reapportionment by State Legislatures: A Guide for the 1980's", 34 Sw.L.J. 607,634 (1980) ("Bickerstaff") ("The most common numerical tool is the use of the percentage of variation from the ideal district to show the 'average deviation' or 'median deviation' of all the districts from the ideal, and the 'total maximum deviation' which is the aggregate total of the percentage of variation from the ideal of the districts with the largest and smallest population.").
 
 
 [6]
 See supra p. 4 & note 3
 
 
 [7]
 The number of votes now set for two-thirds passage is 72
 
 
 [8]
 These calculations, too, are disputed by plaintiffs
 
 
 [9]
 The rationale for this denial (the "majority without a majority vote" or "built-in bias" aspect of weighted voting) is "to assure that sparsely populated areas of a political unit of government have a voice in the councils of government." Greenwald v. Board of Supervisors of the County of Sullivan, 567 F.Supp. 200, 203 (S.D.N.Y.1983) (footnote omitted). For a fuller explication, see Ianucci v. Board of Supervisors of the County of Washington, 20 N.Y.2d 244, 282 N.Y.S.2d 502, 507-08, 229 N.E.2d 195 (1967)
 
 
 [10]
 Of New York State's 57 counties (outside of New York City), 24 employ weighted voting systems. Grofman & Scarrow, "Weighted Voting in New York", IV Legis.L.Q. 287, 288 (May 1981), App. at 64. Unsurprisingly, given the prevalence of such representational plans, the subjection of Nassau County's weighted voting system to constitutional litigation has not been atypical. See Imbriani v. Board of Supervisors of Sullivan County, 568 F.Supp. 1581, 1581 (S.D.N.Y.1983) (upholding the constitutionality of the weighted voting system of the Board of Supervisors of Sullivan County); Greenwald v. Board of Supervisors of Sullivan County, 567 F.Supp. at 206 (same); English v. Lefever, 94 App.Div.2d 695, 46 App.Div.2d 102, 27 N.Y.2d 975, 462 N.Y.S.2d 695, 696 (N.Y.App.Div.1983) (declaring unconstitutionally apportioned Rockland County's legislature having a 37.15% deviation, where defendants failed to prove that their plan had "no practical alternatives"); Jones v. Board of Supervisors of the County of Essex, 46 App.Div.2d 102, 361 N.Y.S.2d 718, 720 (N.Y.App.Div.1974) (upholding the constitutionality of the Board of Supervisors of Essex County where a 1.993% deviation was "so small as to create substantial equality"); Town of Carmel v. Board of Supervisors of Putnam County, 27 N.Y.2d 975, 318 N.Y.S.2d 503, 505, 267 N.E.2d 277 (1970) (allowing a weighted voting plan for the malapportioned Board of Supervisors of Putnam County "solely as a temporary, interim measure" until another plan could be adopted after the 1970 census); Iannucci v. Board of Supervisors of the County of Washington, 282 N.Y.S.2d at 509, 229 N.E.2d 195 (proposed weighted voting plans for Boards of Supervisors of Washington and Saratoga Counties were of "doubtful constitutional validity", necessitating a computer analysis to show otherwise); Shilbury v. Board of Supervisors of the County of Sullivan, 46 Misc.2d 837, 260 N.Y.S.2d 931, 937 (N.Y.Sup.Ct.1965), aff'd, 25 App.Div.2d 688, 267 N.Y.S.2d 1022 (N.Y.App.Div.1966) (though later permanently adopted, a weighted voting plan permitted as a "stopgap" measure for the malapportioned Board of Supervisors of Sullivan County)
 
 
 [11]
 The standing issue was raised but not decided below
 
 
 [12]
 Plaintiffs cite Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), as authorizing the League's participation here. Although silent about organizational standing, the Supreme Court observed that a mayor and certain cities, as intervenors, were trying to sue on behalf of their constituents. But the Court declined to reach that representational standing issue
 "Since they press the same claims as do the initial plaintiffs, we find it unnecessary to decide whether the intervenors would have standing to maintain this action in their asserted representative capacities."
 Id. at 205 n. 23, 82 S.Ct. at 703 n. 23.
 
 
 [13]
 Amended in 1980, Sup.Ct.R. 15(1)(c) was renumbered as Sup.Ct.R. 15.1(a). 28 U.S.C.A.Sup.Ct.Rs. (1977 & Supp.1983). The quoted portion of former Sup.Ct.R. 15(1)(c) does not differ meaningfully from the present version. See id
 
 
 [14]
 Subsequent to the statement that no court--other than the Franklin v. Krause courts--had ever approved such a plan, the "majority without a majority vote" argument was found wanting in Greenwald v. Board of Supervisors of the County of Sullivan, 567 F.Supp. at 205-06. There, Judge Edward Weinfeld also rejected an analogous " 'one-third plus one' " objection that "the representatives of more than one-third of the population cannot block the passage of a two-thirds vote." Id. at 209. In any event, plaintiffs later acknowledged Greenwald in Pl.R.Br. at 16
 
 
 [15]
 In relation to the alleged deviations in the present case, Judge Mishler ably summarized plaintiffs' method
 "Plaintiffs claim that the Franklin v. Krause court omitted an important step from its computation of the range of deviation. They suggest that the degree of under or overrepresentation is not simply the discrepancy between population and voting power, but rather the ratio of that figure to the municipality's population. Plaintiffs then compute the range of deviation by taking the difference between the ratio for the most overrepresented municipality and that for the most underrepresented municipality. Thus, plaintiffs divide the 3.19% discrepancy between the population and voting power of Long Beach, the most overrepresented municipality, by 2.58, Long Beach's percentage of the county population. The resulting figure is 123.64%. Utilizing this analysis, the most underrepresented community is Oyster Bay, with a ratio of 8.52%. The sum of these ratios is 132.16%."
 Mem.Dec. at 7-8, App. at 360-61.
 
 
 [16]
 The court indicated to counsel at oral argument that it might seek the Supreme Court's record
 
 
 [17]
 Although not as clearly presented, these figures were likewise contained in the New York Court of Appeals' opinion appended to the Jurisdictional Statement. See Appellants' Jur.St., App. A at 4a, Franklin v. Krause, 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974). See also Franklin v. Krause, 32 N.Y.2d 234, 344 N.Y.S.2d 885, 887, 298 N.E.2d 68 (1973)
 
 
 [18]
 Sup.Ct.R. 16 was amended in 1980. As quoted, Sup.Ct.R. 16(1)(b) is unchanged. 28 U.S.C.A.Sup.Ct.Rs. (1977 & 1983 Supp.). Sup.Ct.R. 16(6), however, is now Sup.Ct.R. 16.7, but the quoted language has not been altered. Immediately afterwards, though, is added: "The order may be a summary disposition on the merits." Id. Presumably, that new sentence resulted from the Supreme Court's clarifying statements in Hicks and Mandel
 
 
 [19]
 Brown v. Thomson, --- U.S. at ----, 103 S.Ct. at 2698 & n. 8, is perhaps the best illustration of what must be affirmatively done to preclude the Supreme Court from evaluating the deviation from the one person, one vote rule, given its importance in reapportionment controversies. But even in that presumably unusual situation, the extent of the deviation still received troubled comments from members of the majority